IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**SAINT PAUL COMMODITIES, INC.**                                        **PLAINTIFF**

**v.**                                    **CIVIL ACTION NO. 1:24-cv-145-TBM-RPM**

**OLEO-X, LLC**                                                      **DEFENDANT**

---

**OLEO-X, LLC**                                                     **PLAINTIFF**

**v.**                                     **CIVIL ACTION NO. 1:25-cv-71-TBM-RPM**

**ST. PAUL COMMODITIES, INC.**                                     **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Saint Paul shipped yellow grease—a type of renewable feedstock composed of animal fats and oils—to Oleo-X, LLC's plant. Oleo refused to pay though because it claimed the yellow grease was too diluted, resulting in damage to its facility. As a result, Saint Paul initiated arbitration, seeking more than 40 million dollars. Oleo counterclaimed for nearly the same amount. After three days and eighteen witnesses, a panel of industry veterans—not lawyers—unanimously awarded Saint Paul roughly 36% of its demand.

Oleo now seeks to set aside the award and retry the arbitration before a brand new panel. Oleo argues the chair arbitrator was biased because he had a years prior relationship with a Saint Paul witness about the trade of soy oil when that witness worked for a different company. Also, Oleo says the panel improperly relied on a regulation to interpret the contract, and the award did not specifically dismiss Oleo's counterclaims.

But Oleo's concerns are inherent in the type of arbitration process that Oleo desired. Oleo's request for experts in this niche industry came at the expense of complete strangers to anyone in

the industry. An independent council acknowledged this trade-off when it declined to disqualify the chair arbitrator after his disclosure. Further, the panel did not inappropriately rely on the regulation to help determine the industry standard. Finally, the award did not need to explicitly address Oleo's counterclaims. As Oleo's counsel acknowledged, the panel could not have ruled for Saint Paul without dismissing Oleo's counterclaims. Ultimately, Oleo got the arbitration it bargained for—an expedited adjudication before industry experts in the small industry of oil and grease trading. This arbitration was contractually agreed to by Oleo. And the law understandably makes it very difficult for a court to order a redo in arbitration in front of a new panel. Oleo's Motion [43] is denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

Oleo pretreats and processes feedstock, such as animal fats and oils, to produce fuel for its customers in the renewable energy industry. Saint Paul sells fats and oils to companies in the biofuel industry. Saint Paul's Logan Hooyer negotiated two contracts with Oleo. The contracts and their terms are set out in various verbal, text, and email correspondence. And the parties stipulated that it was industry practice for this behavior to constitute a binding contract.

The first agreement was a "spot deal"[1] for Saint Paul to deliver ten railcars of yellow grease to Oleo's Pascagoula plant. The second was a term agreement for Saint Paul to provide weekly shipments of yellow grease through December 2023. The parties agreed that the yellow grease would have a free fatty acid content of 25%.[2] The parties also agreed that the American Fats and

---

[1] "A spot contract is an agreement that enables you to buy and sell an asset at the current market rate, known as the spot price." Becca Cattlin, *What is a Spot Contract?*, IG (Nov. 9, 2020), https://www.ig.com/en/trading-strategies/what-is-a-spot-contract--201109.

[2] The free fatty acid content is an indicator of the grease's quality. Generally, high-quality grease has a low free fatty acid content.

Oils Association (AFOA) trade rules—which contained an arbitration provision and New York law choice of law provision—governed any dispute arising from the contracts.

Oleo's Pascagoula plant underwent an emergency shutdown after workers attempted to run the yellow grease through the centrifuge in Unit 6.[3] It claimed that Saint Paul diluted the yellow grease with brown or trap grease,[4] resulting in too high of a free fatty acid content. Oleo then refused to pay Saint Paul for the delivered yellow grease or accept the remaining deliveries under the parties' term contract.

As a result, Saint Paul initiated arbitration seeking more than 40 million dollars. Oleo counterclaimed for 35-40 million dollars resulting from processing the yellow grease at Oleo's Pascagoula plant. Under the American Fats and Oils Association's arbitration rules, the panel consisted of industry members included on its roster of arbitrators. And arbitration rules used the American Arbitration Association (AAA) for implementation. The three arbitrators selected by the AAA were all experienced businessmen in this industry. They were not lawyers. Once selected, the arbitrators disclosed potential conflicts.

For example, Justin Nielsen, the arbitration chair, disclosed: "I have previously done business with [Saint Paul witness] Logan Hooyer when he was employed at Renewable Energy Group (REG). I have NOT since been in communication or done business with logan since he joined [Saint Paul]." [43-13], p. 1. After receiving this disclosure, Oleo sought further information. Then, Arbitrator Nielsen further disclosed that his interactions with Mr. Hooyer were "minimal,"

---

[3] Oleo clarified at the August 2025 motion hearing that this was the first time that Oleo had dealt with pretreating yellow grease and that, as a result, this was the first time yellow grease had been used in Unit 6.

[4] According to Oleo, trap grease is made from the grease traps located at restaurants and oil service stations, Trap grease may contain foreign materials such as soap, pesticides, detergents, cleansers, solvents, and other waste.

their last communication was over two years before the contracts at issue, and the communication focused on a potential trade involving soy oil. Oleo then objected to Arbitrator Nielsen's appointment—based only on his relationship with Mr. Hooyer. The objection was submitted to the AAA's Administrative Review Council, an independent council.[5] The council denied Oleo's objection.

After both parties conducted extensive discovery, Oleo also requested that the arbitration panel exclude Chris Peterson, Saint Paul's rebuttal expert, from testifying because he had certain relationships.[6] Despite Oleo's arguments, the panel denied this request and determined Peterson was allowed to testify. The panel explained that "trying to find an expert that one or all of [the panel members] have not met or dealt with along the way would be a challenge." [43-20], p. 2. And that "[t]o remove an industry veteran on the merits of his doing business with one of the parties and serving on the Board of Directors/Executive Team with the members of the Panel is absurd." [43-20], p. 2.

The panel scheduled the final hearing date to take place on February 12, 2024, which could "not be changed absent exceptional circumstances, upon a showing of good cause." [47], p. 6. On February 1, 2024, however, eleven days before the final hearing, Oleo's counsel withdrew from the proceeding without explanation. Oleo requested a sixty-day postponement to find new counsel.

---

[5] The council "is an executive-level, administrative decision-making authority created to resolve certain administrative issues" such as arbitrator challenges. American Arbitration Association, *Administrative Review Council*, https://www.adr.org/administrative-review-council/ (last updated Sep. 2024).

[6] For instance, Saint Paul used Mr. Peterson's company's transloading facility in Moundville, Alabama, to load two of its railcars with feedstock. After loading, Saint Paul then shipped those railcars to Oleo on January 23, 2023. However, Mr. Peterson's company did not supply the feedstock that was shipped from his company's transloading facility. Instead, that feedstock was supplied by River Valley Ingredients and Smithfield Farmland. Also, Arbitrator Neilson's company served as Mr. Peterson's company's vegetable oil broker. Further, Mr. Peterson served as First Vice President of the American Fats and Oils Association.

The panel granted the unopposed motion and reset the final hearing for April 8, 2024. On February 8, 2024, in response to the panel's email, Oleo "confirm[ed] receiving the final hearing dates starting on Monday, April 8," noted it was "still working on a replacement counsel," and would "update everyone as soon as possible." [46-21], p. 1. On March 6, 2024, the panel requested a status update to confirm the final hearing date as they had "to plan [their] schedules accordingly." [46-22], p. 3. Oleo responded the next day, stating, "Oleo-X is still working on new counsel. We are committed to keeping everyone updated and we will update everyone at the earliest opportunity, in anticipation of the April 8 hearing." *Id.* Later that month, the panel asked if the parties minded if the hearing was virtual. Oleo responded in part: "Oleo-X agrees to the request for a virtual hearing to be held April 8 to April 10. We are currently awaiting final notice of counsel, and once received, will promptly communicate that to everyone." *Id.* Four days later, and eleven days before the new final hearing date, Oleo's new counsel entered an appearance and requested a postponement of the rescheduled hearing because it had misjudged the complexity of the case and to further prepare for the hearing. The panel denied this request.

The final hearing took place from April 8 to April 10. The parties submitted hundreds of exhibits, testimony from eighteen witnesses, and post-hearing briefs. One of the issues in dispute centered around adulteration. More specifically, whether the yellow grease was adulterated. And the parties argued at length about the meaning of adulteration pursuant to American Fats and Oils Association Rule 6. It states: "Animal tallow and grease *shall contain* only fluids and fatty acids *natural to the product*, *except* for such other substances in such amounts as might occur *unavoidably in accordance with industry practices*." Am. Fats & Oils Assoc., Inc., R. 6 (emphasis added).

The panel of industry experts, after two pages of reasoning and detailed mathematical formulas and calculations, unanimously found that Oleo was liable to Saint Paul for

$16,488,415.05—roughly 36% of the amount it demanded. In its award, the panel explicitly stated its findings regarding the validity and terms of the contracts. Oleo now seeks to vacate that award.

## II. STANDARD OF REVIEW

Under the Federal Arbitration Act, federal courts are limited to a narrow review of arbitration awards. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584, 128 S. Ct. 1396, 170 L. Ed. 2d 254 (2008). "In light of the strong federal policy favoring arbitration, judicial review of an arbitration award is extraordinarily narrow" and "exceedingly deferential." *Cooper v. WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d 534, 543-44 (5th Cir. 2016). Courts may vacate an arbitration award "only in very unusual circumstances." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013). The four grounds listed in Section 10 of the FAA are the exclusive means by which a party can vacate an arbitration award. *Citigroup Glob. Mkts., Inc. v. Bacon*, 562 F.3d 349, 352 (5th Cir. 2009); *see Hall Street Assocs., L.L.C.*, 552 U.S. 576 at 592.

According to Section 10(a), an award can be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudice; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id.* (citing 9 U.S.C. § 10). "The Court does not 'conduct a review of an arbitrator's decision on the merits,' therefore 'arguments concerning the merits are irrelevant' to the Court's 'determination of whether there are statutory grounds within Section 10(a) under which the arbitration award

should be vacated.'" *Vantage Deepwater Co. v. Petrobras Am. Inc.*, 4:18-cv-02246, 2019 WL 2161037, at *2 (S.D. Tex. May 17, 2019) (quoting *Householder Grp. v. Caughran*, 354 F. App'x 848, 851 (5th Cir. 2009)). An arbitration award "may not be set aside for a mere mistake of fact or law." *WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d at 546 (quoting *Rain CII Carbon, L.L.C.*, 674 F.3d at 471-72). The party moving to vacate an arbitration award has the burden of proof, and any doubts or uncertainties must be resolved in favor of upholding the award. *WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d at 544 (citing *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 385, n.9 (5th Cir. 2004)).

### III. DISCUSSION AND ANALYSIS

In seeking vacatur, Oleo raises the latter three statutory grounds available in Section 10(a). Each ground is addressed in turn.

### A. Oleo cannot show evident partiality

First, Oleo argues that Arbitrator Nielsen was evidently partial because of the relationship he had years prior to the arbitration with Logan Hooyer, a Saint Paul employee and witness at the arbitration hearing. Second, Oleo further identifies three evidentiary decisions where Mr. Nielson's alleged implicit bias manifested itself during arbitration.

Under the FAA, courts may vacate an arbitration award "where there was evident partiality or corruption in the arbitrators." *Citigroup Glob. Mkts., Inc.*, 562 F.3d at 352. (quoting 9 U.S.C. § 10(a)(2). The standard for assessing evident partiality, however, is not the mere appearance of bias. *See Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 285 (5th Cir. 2007) (en banc) ("[T]he 'mere appearance' standard would make it easier for a losing party to challenge an

arbitration award for nondisclosure than for actual bias . . .” and “hold arbitrators to a higher ethical standard than federal Article III judges”).

“Evident partiality is a ‘stern standard.’” *WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d at 545 (quoting *Positive Software Sols., Inc.*, 476 F.3d at 281). “The statutory language . . . seems to require upholding arbitral awards unless bias was clearly evident in the decisionmakers.” *Id.* Thus, for the arbitration award to be vacated, Oleo “must produce specific facts from which a reasonable person would have to conclude that the arbitrator was partial to” Saint Paul. *See Householder Grp.*, 354 F. App’x at 852 (citation and internal quotation marks omitted). This is an “onerous burden,” because Oleo must demonstrate that the “alleged partiality was direct, definite, and capable of demonstration rather than remote, uncertain, or speculative.” *Householder Grp.*, 354 F. App’x at 852 (quoting *Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545, 550 (N.D. Tex. 2006)) (citation and internal quotations omitted).

**1. Arbitrator Nielsen’s relationship with Logan Hooyer**

Although Oleo does not contest the veracity of Arbitrator Nielsen’s disclosures, it contends that Arbitrator Nielsen did not “make a full and complete disclosure of the extent and volume of his business dealings” with Mr. Hooyer. [49], p. 2. And, as a result, Oleo argues this Court should infer evident partiality because the alleged insufficient disclosures “leave open the possibility” that Arbitrator Nielsen “did more than trivial business with [Saint Paul’s] key witness.” [44], p. 10. Oleo’s argument fails for a number of reasons.

First, Oleo waived its argument that Arbitrator Nielsen inadequately disclosed his prior business dealings with Mr. Hooyer. “A party seeking to vacate an arbitration based on an arbitrator’s evident partiality generally must object during the arbitration proceedings. Its failure to do so results in waiver of its right to object.” *See Dealers Comput. Servs., Inc., v. Michael Motor*

*Co., Inc.*, 485 F. App'x 724, 727 (5th Cir. 2012); *accord Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir. 1987) (same). Oleo did not object to the adequacy of Arbitrator Nielsen's supplemental disclosures during arbitration. *See Dealers Comput. Servs., Inc.,* 485 F. App'x at 728 n.4 ("[A]rbitrating parties have a reasonably duty to investigate information of potential partiality.") (citing *Lucent Techs., Inc., v. Tatung Co.,* 379 F.3d 24, 28 (2d Cir. 2004); *Kiernan v. Piper Jaffray Cos., Inc.,* 137 F.3d 588, 593 (8th Cir. 1998)). Oleo, instead, relied on the disclosures to challenge Arbitrator Nielsen's appointment. Oleo cannot raise this argument now.

Second, Oleo has not alleged any new facts that Arbitrator Nielsen failed to disclose. Oleo merely asserts that Arbitrator Nielsen's "disclosures and follow-up responses leave open the possibility that he did more than trivial business" with Mr. Hooyer. [44], p. 10. But this is the type of speculation that courts cannot engage in. Indeed, an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography. . . . it is enough . . . that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed." *Id.* And "[t]he judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business." *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 151, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1968) (White, J., concurring).

Third, vacatur would not be appropriate even if Arbitrator Nielsen could have disclosed more about his prior, and minimal, business relationship with Mr. Hooyer. *Positive Software Sols.*, Inc., 476 F.3d at 282 ("nondisclosure alone does not require vacatur of an arbitral award for evident partiality."). In nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding. *Positive*

*Software Sols., Inc.*, 476 F.3d at 283. Instead, "an arbitrator's nondisclosure must involve a 'reasonable impression of bias' stemming from 'a significant compromising connection to the parties' in order for vacatur to be warranted under § 10(a)(2)." *OOGC Am., L.L.C. v. Chesapeake Expl., L.L.C.*, 975 F.3d 449, 453 (5th Cir. 2020) (quoting *Positive Software Sols., Inc.*, 476 F.3d at 282-83 (en banc)). The Fifth Circuit applies the "reasonable impression of bias" standard in deciding whether an arbitration award should be vacated due to nondisclosure. *Positive Software Sols., Inc.*, 476 F.3d at 283. This standard requires "a concrete, not speculative impression of bias and calls for upholding arbitral awards unless bias was clearly evident in the decisionmakers." *OOGC Am., L.L.C.*, 975 F.3d at 453 (citation and internal quotations omitted). So, the question before the Court is whether Oleo has established "specific facts from which a reasonable person would *have* to conclude that the arbitrator was partial to its opponent." *OOGC Am., L.L.C.*, 975 F.3d at 453 (citations omitted) (emphasis in original). Oleo has not and vacatur of the arbitration award is not warranted.[7]

The prior business relationship between himself and Mr. Hooyer arose out of "a routine connection in a highly specialized industry"—"trading RBD soy oil and discussions on DCO (distillers corn oil)"—which "ceased more than two years prior to the facts in this action, and well before Mr. Hooyer" joined Saint Paul. [47], pps. 13, 11; [43-16], p. 2. In fact, this prior relationship took place when Mr. Hooyer was at another company before joining Saint Paul. Arbitrator Nielsen also explained that his prior relationship with Mr. Hooyer was "[s]oley professional." [43-16], p. 2.

---

[7] Notably, almost all of the cases that Oleo relies on discuss *current* business relationships. But it is undisputed that there is no current business relationship between Arbitrator Nielson and Mr. Hooyer. The Court therefore finds those cases cited by Oleo inapplicable and unpersuasive to the instant analysis. And while Oleo also relies on *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 150, 89 S. Ct. 337, L. Ed.2d 301 (1968), it bears little significance to this action, as that case pertained to the nondisclosure of a "repeated and significant" relationship between the respondent and the arbitrator's business resulting in the vacatur of the arbitration award.

And that when the two did interact on behalf of their respective employers, the frequency was "minimal." [44], p. 8. Based on the facts, Arbitrator Nielson and Mr. Hooyer's limited prior business relationship involving soy oil—which was completely unrelated to the arbitrable issue— is too attenuated to infer a "significant compromising connection" to Saint Paul. *OOGC Am., L.L.C.*, 975 F.3d at 453 (dismissing OOGC's argument that the arbitrator's relationship with FTS incentivized the arbitrator to find in favor of the respondent as "speculation on speculation."); *see also Positive Software*, 476 F.3d at 283-84 (holding that vacatur was not warranted where arbitrator and counsel for a party to the arbitration worked on the same litigation for six years but had not spoken to each other prior to the arbitration and describing this relationship as a "trivial former business relationship"); *WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d at 540 (declining to vacate award based on opposing attorney's undisclosed relationship with another arbitrator who belonged to the same arbitral organization as presiding arbitrator).

Again, the AAA independent council did not remove Arbitrator Nielsen after the disclosures and after Oleo's objection. This makes sense as Arbitrator Nielsen and Mr. Hooyer's prior business relationship is "the kind of professional intersection[] that one might expect to find" between any two practitioners in a highly specialized industry. *Affordable Care, LLC., v. McIntyre*, No. 1:21-cv-85, 2023 WL 3620755, at *2 (5th Cir. May 24, 2023). In effect, Oleo now asks this Court to analyze the same allegations that the AAA Administrative Review Council—an independent reviewing committee—considered when Oleo made its objection during arbitration. But despite Oleo's argument to the contrary, the law does not punish sporadic, disclosed, and prior business relationships.

Finally, this Court declines Oleo's invitation to assume that Arbitrator Nielsen must have had some type of implicit bias against Oleo.[8] For this novel argument, Oleo argues that Arbitrator Nielsen had "certain experiences, impressions, and biases about Mr. Hooyer and [Saint Paul's] business practices that would taint his judgment" simply because of his prior business dealings. [43], p. 9. For example, Oleo notes, "if Mr. Nielsen had a positive business experience with Mr. Hooyer in trading feedstock in the past, that would unquestionably taint his ability to fairly and impartially evaluate the facts and witness testimony." *Id.* While Oleo fails to recognize that Arbitrator Nielsen could have also had a bad experience in his past dealings, this hypothetical nevertheless calls for the sort of speculation that is forbidden. *See Salzgitter Mannesmann International (USA) Inc. v. Esmark, Inc.*, 2023 WL 5916566 (S.D. Tex. Sep. 11, 2023) ("Respondents' allegations regarding Arbitrator Zimmerman's comments, interruptions, or manifestations of opinion are not the type of direct and definite evidence capable of demonstrating partiality that is necessary to show actual bias. Rather, they are quintessential examples of the remote and speculative partiality the Fifth Circuit has held insufficient to establish actual bias."). Oleo's implicit bias theory "falls short of a showing of 'specific facts from which a reasonable person would have to conclude that the arbitrator was partial to' a party," and instead is "speculation on speculation." *OOGC America, LLC*, 975 F.3d at 455 (quoting *WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d at 545).

As the Sixth Circuit cautioned in *Uhl v. Komatsu Forklift Co.*:

---

[8] In support of its claim that courts throughout the country have recognized implicit bias, Oleo only cites to *United States v. Ray*, 803 F.3d 244, 259-60 (6th Cir. 2015). This case is neither binding nor persuasive because it merely discussed the potential impact of implicit bias in connection with the use of the word "felon" to describe a criminal defendant at trial. *See id.* More specifically, the Sixth Circuit only acknowledged some legal literature on implicit bias as it relates to racial bias. *See id. Ray* bears no resemblance to this case.

> We will not rush to conclude that an arbitrator is evidently partial. Arbitrators are often chosen for their expertise and community involvement, so '[t]o disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all.'

512 F.3d at 308 (internal citations omitted); *see also Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds,* 748 F.2d 79, 83 (2d Cir. 1984) (noting "[f]amiliarity with a discipline often comes at the expense of complete impartiality," and "specific areas tend to breed tightly knit professional communities"). The Court finds that Oleo has not met its burden of showing a significant compromising connection exists between Arbitrator Neilsen and Mr. Hooyer that would merit vacatur. "The draconian remedy of vacatur is only warranted upon nondisclosure that involves a significant compromising relationship." *Positive Software Sols., Inc.*, 476 F.3d at 286. Oleo's motion for vacatur on this ground is denied.

### 2. Arbitrator Neilsen's acts during the arbitration proceedings

Oleo further seeks vacatur of the award under Section 10(a)(2) on the independent ground that Arbitrator Nielsen displayed evident partiality and bias in his evidentiary decisions. Oleo points to three instances of alleged misconduct: Arbitrator Nielsen's role in (1) making witness creditability determinations; (2) managing witness testimony; and (3) permitting Saint Paul's expert witness to testify. But Arbitrator Nielson's conduct and decisions during the arbitration were well within his discretion, which this Court is not at liberty to second-guess under Fifth Circuit precedent. Regardless, the decisions—even if coupled with the above relationship—do not rise to the level of evident partiality.

An arbitrator has "broad discretion to make evidentiary decisions," *Int'l Chem. Workers Union v. Columbian Chems Co.*, 331 F.3d 491, 497 (5th Cir. 2003), and "courts should not review

the legal adequacy of [the arbitrator's] rulings," *Amalgamated Meat Cutters & Butcher Workmen of N. Am., Dist. Loc. No. 540 v. Neuhoff Bros. Packers, Inc.*, 481 F.2d 817, 820 (5th Cir. 1973).

First, Oleo asserts that the panel erroneously accepted Mr. Hooyer's testimony over Oleo's witness in finding that yellow grease could include trap grease under AFOA Rule 6. Oleo attributes the panel's fact determination to Arbitrator Nielsen because his "implicit bias could have, and likely did, sway other members of the Panel." [49], p. 1. Aside from its conclusory statement, Oleo has not proffered any specific evidence that Arbitrator Nielsen acted beyond his factfinding role. In short, Oleo invites this Court to reconsider the merits of its claims by questioning the panel's credibility determinations of the witnesses and documentary evidence. The Court cannot do so. The limited circumstances enumerated in § 10 of the FAA "do not include vacating an arbitration award based upon the merits of the claims that were heard by arbitrators." *Dream Med. Grp. LLC., v. Old S. Trading Co., LLC.*, No. 22-20286, 2023 WL 2366982, at *2 (5th Cir. Mar. 6, 2023); *accord Parker v. ETB Mgmt., LLC.*, 667 F. App'x 850, 851 (5th Cir. 2016) (per curium) (classifying arguments that the arbitrator ignored conflicting testimonial statements and the credibility of the opposing party's "witnesses [were] so poor that there was no factual basis to support the arbitrator's findings" as attempts to relitigate the merits); *Householder Grp.*, 354 F. App'x at 851.[9] Absent specific allegations that Arbitrator Nielsen inappropriately used his role as the arbitration's chair, the arbitrators' unanimous decision to side with Mr. Hooyer was well within their factfinding role.

Second, Oleo argues that Arbitrator Nielsen's management of the arbitration proceeding favored Saint Paul. Oleo claims that Arbitrator Nielsen: (1) "inexplicably" cut short Oleo's cross-

---

[9] Although *Dream Medical Group, LLC.,* and related unpublished opinions cited "[are] not controlling precedent," they "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006).

examination of Mr. Hooyer; (2) re-called Mr. Hooyer toward the end of the hearing to answer questions from the panel without giving the parties a chance to ask additional follow-up questions; and (3) requested Oleo's counsel to wrap up its cross-examination of Mr. Peterson, Saint Paul's expert witness, on AFOA Rule 6 adulteration issues. But Arbitrator Nielsen's conduct during the arbitration was well within his authority.

To be sure, Rule 26(b) of the AFOA Arbitration Rules provides the arbitrator with plenty of discretion to "conduct the proceeding with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings, and direct the parties to focus on their presentation on issues the decisions of which could dispose of all or part of the case." [43-15], p. 19. Arbitrator Nielsen's management of the testifying witness and the presentation of evidence falls squarely within the AFOA arbitration rules' directives.[10] Accordingly, this Court is not authorized to question Arbitrator Nielsen's decisions concerning the admittance or presentation of evidence at the arbitration—at least to this extent. *See Int'l Chem. Workers Union*, 331 F.3d 491 at 496.

Third, Oleo argues that the panel displayed evident partiality when it refused to exclude Mr. Peterson from testifying as an expert witness for Saint Paul. Oleo appears to attribute this decision to Arbitrator Nielsen because he "denied Oleo permission to even file a motion to disqualify Mr. Peterson from the hearing." [43], pps. 13-14 (citing [43-21]). This argument, however, is unsupported by the record as Arbitrator Nielsen responded to Oleo's request, stating: the "Panel also grants Oleo-X permission to file a motion disqualifying Chris Peterson." [43-21],

---

[10] For example, Arbitrator Nielsen requested that Oleo conclude its cross-examination of Mr. Hooyer "to keep pace" with "the [] hearing schedule." [43-26], p. 10. To be sure, after Oleo's counsel raised Mr. Hooyer's importance to the case in response, Arbitrator Nielsen granted its request to shorten other cross-examinations instead. *Id.* at pps. 164-66. Likewise, Oleo was an hour and a half into its cross-examination of Mr. Peterson before Arbitrator Nielsen interrupted with time management concerns. [43-30], p. 16. And, finally, Arbitrator Nielsen re-called Mr. Hooyer because the panel—not just Arbitrator Nielsen—had follow-up questions based on testimony from witnesses following Mr. Hooyer. [43-28], p. 3, 5.

pps. 6-7. Moreover, it was the entire panel that unanimously overruled Oleo's objection—not just Arbitrator Nielsen. *See* [43-21], p. 2 (signing ruling as "The Panel"). Nevertheless, Rule 27(b) of the AFOA Arbitration Rules authorized Arbitrator Nielsen, along with the two other panelists, to ultimately reject Oleo's motion. Rule 27(b) requires the arbitrator to "determine the privilege, admissibility, relevance, and materiality of the evidence offered and exclude evidence deemed by the arbitrator to be privileged, cumulative, or irrelevant." [43-15], p. 9. The panel's decision to permit Mr. Peterson to testify was within its evidentiary gatekeeping role under AFOA Rule 27(b).[11]

The panel's explanation also highlights why the Court is not eager to accept Oleo's argument. The panel noted: "One must understand that our chosen industry is not massive, so trying to find an expert that one or all of us has not met or deal with along the way would be a challenge." [47], p. 7.

### 3. Arbitrator Nielsen's relationship with Saint Paul

Oleo appears to briefly argue that Arbitrator Nielsen was "evidently partial" to Saint Paul based on another prior business transaction between himself and Robby Martin, another Saint Paul employee. *See Dealers Comput. Servs., Inc.,* 485 F. App'x at 727 ("A party seeking to vacate an arbitration based on an arbitrator's evident partiality generally must object during the arbitration proceedings. Its failure to do so results in waiver of its right to object."). But Oleo waived this argument. *See Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir. 1987). It knew of this

---

[11] The panel's decision—whether Mr. Peterson's testimony would be admissible, relevant, and material in resolving the arbitration—was evidentiary at its core. And, although it is not the Court's role to second-guess an arbitration panel's decisions, the record supports its rejection of Oleo's motion. In response to Oleo's motion to exclude, Saint Paul highlighted Mr. Peterson's deposition testimony. There, he stated that he would "provide the [p]anel with helpful testimony" based on his seventeen-year career in the industry, in which he "personally executed or over[saw] nearly $3 billion in feedstock procurement contracts." [46-16], p. 3. And, contrary to Oleo's arguments at the time, Mr. Peterson's extensive trading history, [43-20], p. 3, and connections to the AFOA, *id.* at p. 3-4, are easily seen as reasons why the panel qualified Mr. Peterson as Saint Paul's expert witness.

business transaction before it requested Arbitrator Nielsen's disqualification because Arbitrator Nielsen disclosed it on his own after he submitted his initial disclosure. And, as Oleo's counsel acknowledged at the motion hearing, it did not raise Arbitrator Nielsen's previous dealings with Saint Paul as a basis for removal in its objection to the AAA, *see id.* at 23:12-14, nor did it raise it during the arbitration proceeding, [47], p. 15. Therefore, Oleo may not make this argument now, and its motion for vacatur on this ground is denied.[12]

## B. Arbitrators were not guilty of misconduct

Under Section 10(a)(3), vacatur is appropriate "where the arbitrators were guilty of misconduct in refusing to postpone the hearing . . . or in refusing to hear evidence pertinent and material to the controversy." citing 9 U.S.C. § 10(a)(3). Oleo contends that the panel was guilty of misconduct for two reasons: (1) its denial of Oleo's second requested continuance and (2) Arbitrator Nielsen's interjections during witness testimony.

### 1. Postponement of arbitration hearing

Specifically, Oleo argues that the panel's denial of the postponement deprived it of a fair hearing because its newly retained counsel could not adequately prepare for the arbitration in ten days. A court "will not intervene in an arbitrator's decision not to postpone a hearing *if any* reasonable basis for it exists." *Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400 (5th Cir. 2006) (emphasis added) (quoting *El Dorado Sch. Dist. No. 15 v. Continental Cas. Co., 247* F.3d 843, 848 (8th Cir. 2001)). The record supports at least two bases on which the panel could have reasonably denied the postponement.

---

[12] Even if Oleo had not waived this argument, Arbitrator Nielson's relationship with Saint Paul does not rise to the level of evident partiality, as the law regarding evident partiality makes clear.

First, the panel could have reasonably decided that it needed to enforce the arbitration agreement's terms to prevent the arbitration from spiraling into drawn out and lengthy litigation. The agreement stated: all deadlines "will be strictly enforced and adhered to in order to avoid unnecessary delay and to ensure an expedient and fair resolution of this matter." [46-14], ¶ 25. By the time Oleo made its second request, the arbitration had been pending for just shy of a year, the parties had incurred millions of dollars in expenses, and yellow grease was still sitting in Saint Paul's railcars at Oleo's factory in Pascagoula. The panel could have concluded "that the proceeding had already been protracted so long as to violate the policy of expeditious handling of such disputes." *Laws*, 452 F.3d at 400 (quoting *Schmidt v. Finberg,* 942 F.2d 1571, 1574 (11th Cir. 1991)). To be sure, rescheduling the arbitration again would have required finding a new week that worked for three arbitrations (who are industry leaders), eighteen witnesses, and the litigation teams for both parties.

Second, it would have been reasonable for the panel to decide that further delay was inequitable. Although it was just eleven days before the final hearing, Saint Paul did not oppose Oleo's first motion to postpone so Oleo could remedy its prior counsel's abrupt and unexplained departure. This was unopposed despite that Saint Paul was almost certainly preparing for a complex arbitration with many witnesses. Saint Paul only asked the panel not to push back the arbitration hearing again. But even after Oleo confirmed the new hearing date three times, Oleo requested its second continuance just three days after its last confirmation despite recognizing it would be "the second continuance granted on the eve of the merits hearing in this case, which causes some inefficiencies." [43-22], p. 3. Oleo also noted its request, if granted, would "inconvenience" the panel, Saint Paul, and its counsel. *Id.* Notwithstanding the fact that these

18

factors could be reasonable bases in themselves, "the panel may have concluded that" Oleo "was responsible for [its] situation." *Laws*, 452 F.3d at 401.

Oleo has not established that the denial deprived it of a fair hearing. In fact, Oleo provides no specifics about what it may have done differently, even if it had months to prepare.[13] Likewise, Oleo does not put forward any prejudice. Oleo has not explained "how [it] would have presented [its] case differently had [it] been given more time" or "that a continuance might have altered the outcome of the arbitration." *Laws*, 452 F.3d at 400. This Court cannot conclude that Oleo was deprived of a fair hearing.[14]

### 2. Refusal to hear material and pertinent evidence

Oleo further contends that Arbitrator Nielsen's interjection during Oleo's cross-examination of Mr. Hooyer and Mr. Peterson "amount[ed] to a refusal to hear evidence material and pertinent to the controversy, including the terms and nature of the parties' deal." This Court disagrees.

Each of the parties to an arbitration must be given an "adequate opportunity to present its evidence and arguments." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300 (5th Cir. 2004) (citations omitted). Even so, "an arbitrator is not bound

---

[13] Although Oleo takes issue with the panel's reliance on the EPA regulation defining "renewable biomass," the regulation's importance at arbitration appears to have been a mutually unexpected point of contention that the panel focused on. Indeed, neither party explicitly relied on the EPA regulation in their pre-arbitration briefs, or otherwise objected to the relevance of the EPA regulation. Rather, it was Oleo's expert witness who put the regulation into issue in the first place during his testimony. This is common in trial-like proceedings; it is not a ground for vacatur. Moreover, even after fifteen months, Oleo has maintained the same argument—that the EPA regulation is inapplicable to resolving the dispute. It made the argument during the arbitration hearing and in its post-hearing brief. Not once during the three-day hearing, however, did Oleo raise an objection for the panel to rule upon that would bar any consideration of the EPA regulation.

[14] Oleo attempts to argue that the panel's denial of its second motion to postpone the arbitration is evidence of Arbitrator Nielsen's evident partiality as well. But it does not cite any law that supports this argument. Regardless, this argument is rejected for all of the reasons stated in this opinion.

to hear all of the evidence tendered by the parties." *Id.* The informal nature of arbitration proceedings "require 'expeditious and summary hearing, with only restricted inquiry into factual issues.'" *Forsythe Intern. S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990) (quoting *Legion Ins. Co. v. Ins. Gen. Agency, Inc.,* 822 F.2d 541, 543 (5th Cir. 1987). Additionally, "a federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings" such that "the exclusion of evidence deprives a party of a fair hearing." *Id.* Once again, this standard requires a showing of misconduct and a resulting prejudice. *See Householder Grp.*, 354 F. App'x at 851.

Arbitrator Neilsen did request that Oleo's counsel wrap up its cross-examination of Mr. Hooyer "to keep on pace" with the hearing schedule. [43-26], p. 10. However, Arbitrator Nielsen immediately granted Oleo's request to "shorten some of [its] other cross-examinations rather than [Mr. Hooyer]." *Id.* Likewise, Arbitrator Nielsen only commented after Mr. Peterson had been testifying for an "hour and a half." *See* [43-30], p. 16. It seems that Arbitrator Nielsen's primary concern was hearing all eighteen witnesses during the three-day arbitration. *See id.* ("I just kindly want to remind—this is Chair Nielsen—that both legal counsels have until 3 p.m. Wednesday afternoon, April 10th, to conclude . . . just so we're managing appropriate time per witness."). This is not misconduct. It is the expectation. *See Forsythe Inter., S.A.,* 915 F.2d at 1022 ("Because 'the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively and expedite the proceedings before him.'") (quoting *Fairchild & Co., Inc. v. Richmond, F. & P. R. R. Co.,* 516 F. Supp. 1305, 1313 (D.D.C. 1981)). Oleo identifies no evidence that Arbitrator Nielsen erroneously excluded, and Oleo also does not identify any prejudice to its rights that deprived it of a fair hearing on this ground.

20

Without more, Oleo has not shown that the panel's refusal to grant its second motion for a continuance or that Arbitrator Nielsen's interjections amount to misconduct. Oleo did not carry its burden of proving that it was deprived of a fair hearing.

## C. Oleo fails to show that the panel exceeded its powers

Finally, Oleo argues that the final award requires vacatur under Section 10(a)(4). In an attempt to shoehorn its disappointment with the panel's award under a statutory ground for vacatur, Oleo contends that the panel exceeded its powers by manifestly disregarding AFOA Rule 6 and the arbitration agreement's terms.

### 1. Manifest disregard for the law

Specifically, Oleo argues that the "[p]anel's reliance on an ineffective and inapplicable EPA regulation over AFOA Rule 6 in determining the trap grease issue constitutes a manifest disregard of the law." [44], p. 19.[15] As support, Oleo cites two unpublished cases for the proposition that: "the Fifth Circuit leaves open the possibility of manifest disregard as being tethered or subsumed" in Section 10(a)(4). *Id.* at 18. Since the parties filed their briefs, however, the Fifth Circuit has rejected this argument.

In *U.S. Trinity Energy Services, L.L.C. v. Southeast Directional Drilling*, the Fifth Circuit stated that it has "never held that 'manifest disregard of the law' is a basis to establish that arbitrations 'exceeded their powers'" under Section 10(a)(4). 135 F.4th 303, 309 (5th Cir. 2025). The cases cited by Oleo explicitly declined to decide whether manifest disregard of the law could

---

[15] Oleo also seemed to argue at first that the panel manifestly disregarded New York law, which the arbitration agreement set out as the governing law. Oleo said that New York's Administrative Code excludes trap grease from yellow grease in New York's Waste Management industry. *SEE* N.Y. COMP. CODES R. & REGS. TIT. 6, § 360.2(b)(329). Oleo's counsel, however, recognized during the August 2025 motion hearing that this New York administrative code is actually inapplicable because it relates to the "Solid Waste Management Facilities General Requirements" in New York. As a result, Oleo was attempting to show other examples of laws that the panel should have disregarded. Oleo has not claimed that the panel ignored any other New York law to support its vacatur argument.

be an independent ground for relief under Section 10(a)(4). *See McKool Smith, P.C. v. Curtis Int'l, Ltd.*, 650 F. App'x 208, 212 (5th Cir. 2016) (noting the Fifth Circuit had not and does not in its opinion "explicitly decide" whether manifest disregard of the law can be statutory grounds under Section 10(a)(4) for vacatur); *DynaColor, Inc. v. Razberi Technologies, Inc.*, 795 F. App'x 261, 264 (5th Cir. 2020) (same). Section 10(a)(4) is designed to "provide relief when an arbitrator refuses to even consider a contract's basic commands while protecting the arbitrator's virtue of resolving disputes straightaway—not provide a backdoor for a party to seek judicial review of the arbitrator's interpretations." *U.S. Trinity Energy Servs., L.L.C.*, 135 F.4th at 310. Otherwise, it would "rewrite the question a judge must ask from 'whether the arbitrators construed the contract at all' to 'whether they construed it correctly.'" *Id.* at 310. In sum, Oleo's arguments fail because it "essentially ignores its inapplicability as an independent basis while simultaneously attempting to subterfuge this non-statutory ground for vacatur" within Section 10(a)(4). *Id.* at 309.

### 2. Interpretation of the contract

Although Oleo casts its argument in terms of "manifest disregard," [44], p. 20, out of an abundance of caution, and purely alternatively, the Court will analyze whether the panel exceeded its power by failing to interpret the contract at all. Oleo argues, the panel did not apply AFOA Rule 6 properly,[16] and that the panel—made up of non-lawyers—failed to address its argument that Saint Paul breached the contract despite "clear evidence" that the yellow grease exceeded contract specifications, *id.* at 19. This does not appear to be the case.

---

[16] Again, Oleo argues that the panel's alleged failure to interpret AFOA Rule 6 illustrates Arbitrator Nielsen's evident partiality. It does not cite any law illustrating that courts have interpreted such an argument under Section 10(a)(2). Notwithstanding the fact that the Fifth Circuit does not recognize "manifest disregard of the law" as a valid ground for vacatur, this argument fails for the reasons addressed in this opinion.

"An argument for vacatur under Section 10(a)(4) must be balanced against the parties' agreement to have the arbitrators interpret their agreement, which means that 'an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's views of its (de)merits.'" *Vantage Deepwater Co. v. Petrobras Am., Inc.*, 966 F.3d 361, 375 (5th Cir. 2020) (quoting *Oxford Health Plans LLC*, 569 U.S. at 569). "A party seeking relief under that provision bears a heavy burden." *Oxford Health Plans, LLC,* 569 U.S. at 569. "The sole question is whether the arbitrators even arguably interpreted the agreement in reaching their award; it is not whether their interpretations of the agreement or the governing law were correct." *BNSF Ry. Co. v. Alstom Transp., Inc.,* 777 F.3d 785, 789 (5th Cir. 2015) (quoting *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194-95 (7th Cir. 1987)). "The award will often suggest on its face that the arbitrator was arguably interpreting the contract." *BNSF Ry. Co.*, 777 F.3d at 788. For example, the Fifth Circuit noted, "relevant evidence includes but is not limited to: (1) whether the arbitrator identifies her task as interpreting the contract; (2) whether she cites and analyzes the text of the contract; and (3) whether her conclusions are framed in terms of the contract's meaning." *Id.* The Court "resolve[s] any doubts in favor of arbitration." *Id.* On its face, the award suggests the arbitrators were interpreting the contract.

First, the panel makes findings consistent with a contract interpretation analysis. After "having duly heard the proofs and allegations of the parties" and "based upon the evidence put forth," the panel noted it "determined that [Saint Paul] and Oleo both agreed to the following contracts and are valid contracts . . ." [43-1], p. 2. The panel then went on to list the two contracts agreed upon and their terms. *See id.* The panel also specifically described their findings on the specifications called for by each contract, including the 25% free fatty acid requirement. *Id.*

Second, the award includes specific and appropriate analysis. The award includes a detailed breakdown of how it calculated its damages. *Id.* at p. 3. Also, although the panel does not specifically mention AFOA Rule 6, the award's analysis pertains to the rule. For context, both parties acknowledged that AFOA Rule 6 governed. And one issue the panel was tasked with deciding was whether brown or trap grease is "natural" to yellow grease or if any brown or trap grease is allowed to be mixed with yellow grease.[17] Absent an express agreement governing the inclusion or exclusion of brown or trap grease, the issue turned on the competing views of the law and facts. The EPA regulation and Renewable Fuel Standard (RFS) Program were relevant in making this determination. Per Oleo's request, Saint Paul provided Oleo with an RFS certification. This certified that all of Saint Paul's yellow grease provided to Oleo satisfied the EPA's definition of "renewable biomass" as "food waste," which could include brown or "trap grease." *See* [46-1], p. 2. Saint Paul contended that this certification and the referenced EPA regulation were indicia of industry standards. Oleo, as it still does today, argued that these items were irrelevant to the dispute. The award sets out portions of the logic on why the panel sided with Saint Paul. Based "on the facts as presented to [the panel] *and trade rules associated* with these transactions," the panel concluded that trap grease is an allowed feedstock under the RFS program. The panel concluded that the industry accepts "trap grease to be components of yellow grease feedstock and does apply to the agreed upon specifications of 25% [free fatty acid] / 2% MIU." *Id.* And, because Oleo requested Saint Paul to certify that its yellow grease met the EPA's definition of "renewable biomass," Oleo arguably intended to incorporate that industry standard into its contract.

---

[17] AFOA Rule 6 states: "Animal tallow and grease shall contain only fluids and fatty acids *natural* to the product, except for such other substances in such amounts as might occur unavoidably in accordance with industry practices." Am. Fats & Oils Assoc., Inc., Rule 6 (emphasis added).

The context provided is not to relitigate the merits. That is not this Court's job. *See U.S. Trinity Energy Servs., L.L.C.*, 135 F.4th at 310 ("When parties agree to resolve a dispute through arbitration, a federal court's interpretation of substantive contractual terms is often 'beside the point because it is not our interpretation that the parties bargained for.'") (quoting *BNSF Ry. Co.,* 777 F.3d at 789. Although the panel does not explicitly refer to AFOA Rule 6 in its award, the context illustrates that the award explicitly laid out enough logic in reaching its conclusion. *See Forsythe Inter., S.A.,* 915 F.2d at 1022. Neither party disputed that AFOA Rule 6 prohibited adulteration of unnatural fluids and fatty acids. Rather, the primary dispute during arbitration was whether brown and trap grease were natural or adulterants to yellow grease, as contemplated by the contract. The panel found the EPA regulation—which Oleo asked Saint Paul to provide—persuasive that brown and trap grease was natural to yellow grease and, therefore, permitted under AFOA Rule 6. Whether the panel was right or wrong, one thing is clear—the panel's analysis pertained to AFOA Rule 6's definition of "natural." That is all the law requires. *See BNSF Ry. Co.,* 777 F.3d at 789 (quoting *Hill*, 814 F.2d at 1194-95 (stating the question "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract.")).

Third, the panel's conclusion is framed within the contract's meaning. Contrary to Oleo's argument, the award indicates one of the reasons why it did not need to address Oleo's counterclaim that Saint Paul breached the contract for failing to provide yellow grease with the correct specifications. The award states: "Per AFOA Rule 23, Oleo did not inspect rail cars prior to offloading." [43-1], p. 3. AFOA Rule 23 sets out various protocols and procedures for ensuring that products meet the parties' contracted for specifications. It was argued at the arbitration that

Oleo did not adhere to the procedures. The panel's conclusion that only Saint Paul was entitled to damages was well within the contract's meaning.

### 3. Imperfect execution by rendering a partial or complete award

Oleo further argues that vacatur is warranted because the panel rendered a partial or incomplete award. Oleo contends that the award should have "address[ed] Oleo's counterclaims and included the single word, 'final.'" [44], pps. 23-25. A "reasoned award"[18] only "requires the arbitrators to submit 'something short of findings and conclusions but more than a simple result.'" *YPF S.A. v. Apache Overseas, Inc.,* 924 F.3d 815, 820 (5th Cir. 2019) (quoting *Sarofim v. Tr. Co. of the W.,* 440 F.3d 213, 215 n.1 (5th Cir. 2006)). The only question is whether the panel "issued more than a mere announcement." *Id.* In *Rain CII Carbon, LLC,* the Fifth Circuit held the arbitrator issued a reasoned award when it "laid out the facts, described the contentions of the parties, and decided which of the two proposals should prevail." 67 F.3d at 474.

The panel did issue a reasoned award. In the second paragraph, the panel briefly described the facts leading up to the dispute. The panel then explicitly stated its findings on the contentions between the two parties. As Oleo puts it, "[t]he [p]anel was tasked with determining (1) if there was an enforceable contract under New York Law; (2) if so, the terms of the contract; and (3) whether there was any breach of any contractual obligation or breach of good faith and fair dealing covenant under New York Law." [44], p. 3. In paragraphs three through five on the first page, the panel found that two contracts were formed and their terms. *See* [43-1], p. 2. And as noted above,

---

[18] In the interest of thoroughness, it is not clear that the panel was even required to provide a "reasoned award." Under the AFOA, "[t]he arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate." Am. Fats & Oils Assoc., Inc., R. 39. Neither party offers any evidence that such a request was made. Given the award's nature, however, the Court recognizes that it satisfies the "reasoned award" standard.

in the first paragraph on the third page, the panel seemed to dispense with Oleo's counterclaim because it did not inspect the railcars under AFOA Rule 23. *See* [43-1], p. 2. Moreover, as Oleo conceded to the Court during the August 2024 motion hearing, the panel's ruling for Saint Paul was mutually exclusive to a ruling for Oleo on its counterclaims. It was impossible for the panel to find affirmatively on both because Saint Paul could not have won unless the panel found—which it did—that yellow grease could include brown or trap grease as mixed in those amounts by Saint Paul.[19] As a result, Saint Paul could not have damaged the Pascagoula plant since the panel found the yellow grease mixture was appropriate under the contract. So the fact that the panel did not add a few words to explicitly state its denial of Oleo's counterclaims is not fatal to the award. Finally, the award states that the panel awarded Saint Paul $16,688,415.05 and describes its calculations for reaching that amount. Even though the award does not include the word "final," "it is, at the very least, doubtful that the award is not more than a simple result." *Rain CII Carbon, LLC*, 674 F.3d at 474.

Accordingly, the parties got what they bargained for—an arbitration panel made up of industry experts in the niche industry of feedstock commodities. None of the panelists were lawyers. They were all experienced in the oil and grease industry—not with writing lengthy briefs and opinions. It is only natural, then, that their award was not a robust legal opinion citing authorities and addressing every single argument and claim made. Nor did the law require that of them. The Court finds that Oleo has not carried its burden of proving that the panel interpreted anything but the contract. Vacatur is not appropriate under Section 10(a)(4).

---

[19] Moreover, Oleo never informed the panel that it had to specifically deny its counterclaims if the panel found in favor of Saint Paul.

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that Oleo-X, LLC's Motion to Vacate Arbitration Award [43] IS DENIED.

IT IS FURTHER ORDERED AND ADJUDGED that the arbitration award issued on May 10, 2024,[20] in favor of Saint Paul Commodities, Inc. is confirmed pursuant to 9 U.S.C. § 9.[21]

THIS, the 6th day of October, 2025.

**TAYLOR B. McNEEL**
**UNITED STATES DISTRICT JUDGE**

---

[20] At the March 10, 2025, telephonic status conference in this matter, the parties agreed to a briefing schedule. Instead of filing competing motions—one to vacate the arbitration award and one to confirm it—which would have required unnecessarily cumulative responsive briefing, Saint Paul deferred to Oleo to file its Motion to Vacate. This reflected an understanding that Saint Paul would argue its position on confirming the award in response to Oleo's motion, and that if the Court denied Oleo's Motion to Vacate, then the Court would enter a judgment confirming the arbitration award. This briefing schedule was memorialized in the Court's March 10, 2025, Text Order. Having denied Oleo's Motion to Vacate and now confirmed the arbitration award, a separate final order to that effect will be entered alongside this opinion.

[21] At the August 2025 motion hearing, Saint Paul asked the Court to affirm the award, enter judgment on the award, permit Saint Paul to file a declaration proving up additional damages that have accrued since the entry of the award, and to immediately enter an order against Oleo to empty the tank cars and return them to Saint Paul. But apart from their request at the motion hearing, Saint Paul did not move for all of this relief in a written motion. Without more, the Court declines to order all relief requested at the motion hearing. Of course, Saint Paul can file any post award motions that are appropriate under the law.

28